# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

AECOM TECHNICAL
SERVICES, INC.,

     Plaintiff,

v.                              Case No: 8:18-cv-2981-KKM-TGW

PROFESSIONAL SERVICES
INDUSTRIES, INC.,

     Defendant.

_____

## ORDER

In 2017, the Tampa Hillsborough Expressway Authority hired Kiewit Infrastructure South Co. to build an extension to Tampa's Selmon Expressway. Kiewit, in turn, contracted with AECOM to perform the design services for the extension and AECOM then hired Professional Services Industries (PSI) as a subcontractor to perform the geotechnical investigations on the project. This case arises from a dispute between those last two parties over whether PSI was obligated to perform certain services in its geotechnical investigations.

When Tampa sought to extend the Selmon Expressway, it issued a Request for Proposal (RFP) and entertained bids from contractors who wanted to develop the project.

One contractor, Kiewit, teamed up with AECOM, the plaintiff in this case, to bid on the project. Kiewit proceeded as the general contractor and AECOM as a subcontractor for design services. AECOM brought on PSI as its pre-award geotechnical subcontractor and, if Kiewit was awarded the contract, PSI agreed to provide AECOM with the geotechnical data needed for AECOM's designs.

Tampa ultimately awarded Kiewit the project, and Kiewit quickly executed an agreement with AECOM to supply design services for the project. Days later, AECOM executed a contract with PSI. Each contract incorporated to some extent the other contracts in the project. Thus, PSI's contract with AECOM incorporated AECOM's contract with Kiewit and AECOM's contract with Kiewit incorporated Kiewit's contract with Tampa and finally, Kiewit's contract with Tampa incorporated provisions of the RFP.

After execution of the contracts and as the team started on the project, a representative from Tampa noted that PSI's scope of services did not conform to the requirements listed in Tampa's RFP. Specifically, it did not account for what Tampa called the Pilot Hole Program (PHP). In response, PSI contended its scope of services was sufficient to satisfy all its contractual obligations to AECOM. When AECOM insisted that PSI must comply with Tampa's interpretation of the RFP, PSI refused absent increased compensation. AECOM then hired a third-party to perform the PHP and brought this action for breach of contract based on the differing interpretations of the

contract, breach of contract for suspension of performance, negligence, and negligent misrepresentation. PSI responded with two counterclaims, asserting breach of contract and unjust enrichment.

Both parties now move for partial summary judgment. Each party seeks partial summary judgment ruling that the contract means what they say it means. PSI further moves that AECOM's second breach of contract claim fails because PSI never suspended performance and that all of AECOM's damages are barred under the "first cost" doctrine. PSI also moves for summary judgment against AECOM's negligence and negligent misrepresentation claims and for partial summary judgment that AECOM is liable to PSI for certain invoices included in PSI's counterclaims.

The Court concludes that PSI's contract with AECOM incorporated the RFP and that the RFP required the PHP. The Court therefore grants AECOM's motion for partial summary judgment and denies PSI's motion for partial summary judgment on the same issue. The Court also denies PSI's motion for summary judgment against AECOM's negligent misrepresentation claim, PSI's motion for summary judgment that all of AECOM's damages are barred under the "first cost" doctrine, PSI's motion for summary judgment against AECOM's negligence claim, and PSI's motion for partial summary judgment on its counterclaims. But the Court grants PSI's motion for summary judgment against AECOM's breach of contract claim alleging suspension of performance.

## I.  BACKGROUND

Tampa issued an RFP in January 2017, seeking a contractor to build an extension to Tampa's Selmon Expressway. (Doc. 84 at 1–2.) The proposed extension was a 2.5 mile "elevated roadway" consisting of "two 15-foot lanes with inside and outside 6-foot to 12-foot shoulders." (Doc. 84-1 at 15 (RFP section I.).) The RFP sought a contractor to conduct "all investigations, design, permitting, coordination, final approved construction documents and the construction activities necessary" to build the Selmon West Extension. (*Id.* at 13.) Importantly, the elevated roadway would be supported by sixty piers each with a foundation secured by four to six shafts drilled in the ground. (Doc. 86 at 2.) Because each proposed foundation included more than two drilled shafts, the foundations were considered "redundant." (*Id.*)

Before drilling the shafts, a contractor must investigate the subsurface area due to the volatility of the area's soil. That investigation would then provide the data necessary to design the support for the foundation and drilled shafts. (Doc. 83 at 6.) A contractor accomplishes this investigation by using a variety of borings to investigate the subsurface area. (*Id.* at 6–7; Doc. 98 at 5.) This dispute centers on how many and what kind of borings the RFP required the contractor to perform in investigating the subsurface terrain.

According to the RFP, the contractor must complete all geotechnical services necessary to construct the expressway extension. These geotechnical services included

"[e]valuating geotechnical conditions to determine the drilled shaft diameter and length and construction methods to be used." (Doc. 84-1 at 52–53 (RFP section VI.C).) Specifically, the RFP required that the contractor "[p]erform[] the subsurface investigation and drill[] pilot holes prior to establishing the drilled shaft tip elevations and socket requirements." (*Id.* at 53.) The subsurface investigation for redundant drilled shaft foundations required the contractor to "perform at least one test boring in accordance with the Soils and Foundations Handbook at each bent/pier." (*Id..*) "For non-redundant drilled shaft foundations," the contractor must "perform at least one SPT boring in accordance with the Soils and Foundation[s] Handbook at each drilled shaft location prior to establishing the drilled shaft tip elevations and socket requirements." (*Id.*) The RFP further required, in item (4) of the requirements for Drilled Shaft Foundations for Bridges and Miscellaneous Structures, that the contractor "[p]erform[] pilot borings for each shaft location . . . and load test shafts and provid[e] the results of the pilot hole borings and the computations of calculated shaft tip elevations to the Authority at least one[] week before beginning construction of these shafts." (*Id.*) Testimony from various witnesses confirms that test borings are used to obtain data on the general subsurface area surrounding the boring and pilot borings are used to obtain data on the specific shaft location.[1] (*See, e.g.,* Doc. 85-8 at 8.)

---

[1] PSI disputes this definition of pilot borings but fails to point to any evidence in the record that contradicts AECOM's definition. (Doc. 98 at 18 & n.14.)

On October 10, 2016, Kiewit teamed with AECOM to bid on the expressway contract with Kiewit operating as the contractor and AECOM as the designer. (Doc. 84-2 at 1.) In January 2017, after AECOM and Kiewit entered into an agreement to prepare a proposal for Tampa, AECOM began negotiations with PSI for it to provide geotechnical services for the project. (Doc. 84 at 2.) PSI reviewed the RFP, provided a geotechnical write-up for AECOM, and became the geotechnical subcontractor on the proposal. (Doc. 84 at 2–3.)

On June 21, 2017, PSI submitted its initial proposal to AECOM describing the scope of services it would provide for the project. (Doc. 84 at 6.) As PSI prepared the scope of services, it relied in part on the Soils and Foundations Handbook referenced in the RFP. (Doc. 84 at 5.) A little over a month later, PSI provided AECOM with a revised scope of services, wherein it promised to "perform up to 60 [Standard Penetration Test (SPT)] borings . . . in each shaft boring location[]." (Doc. 84-13 at 1.)

Tampa awarded Kiewit the contract on August 7, 2017, and the two executed a fixed-price contract (Prime Contract). (Doc. 84 at 9.) Two days later, Kiewit executed an agreement with AECOM to "cooperate in carrying out the [Selmon West Extension Project] in a relationship of mutual trust," agreeing that AECOM "assumes toward [Kiewit] all of the obligations and responsibilities that [Kiewit] assumes toward [Tampa] . . . insofar as applicable to the Design Services to be provided by [AECOM]."

6

(Doc. 84-17 at 1–2.) Two weeks after Kiewit and AECOM executed their contract (Design Contract), AECOM and PSI entered into an agreement for PSI to perform the "geotechnical field exploration and laboratory testing as described in the . . . Scope of Services," which PSI provided to AECOM on July 28, 2017. (Doc. 84-18 at 10.) In addition to the Scope of Services, PSI "assume[d] toward AECOM all of the obligations and responsibilities that AECOM assume[d] toward Kiewit." (*Id.* at 1.) Kiewit then formally entered into its contract with Tampa on September 7, 2017, agreeing "to do all the work and furnish all the materials, equipment, supplies, and labor necessary to carry out this Contract in the manner and to the full extent as set forth in the Request for Proposal, and the Contractor's Proposal, which are incorporated by reference herein." (Doc. 84-16 at 1.)

Around December 22, 2017, after all the contracts had been executed, Tampa's representative commented to Kiewit, AECOM, and PSI that "the project scope requires for pilot holes to be completed for each of the drilled shafts on the project." (Docs. 86 at 8; 84-22 at 3.) As the dispute evolved, the parties referred to this requirement as the Pilot Hole Program (PHP). (Doc. 86 at 9.) One of the PSI employees disagreed, noting that "[r]edundant shafts do not require pilot hole boring[s] at every shaft location." (*Id.*) But the Tampa representative persisted, responding that "the project scope clearly indicates that pilot hole borings are required for each drilled shaft location." (*Id.*)

In its proposed scope of services, PSI suggested performing sixty SPT borings, one for each foundation. (Doc. 84-13 at 1.) Under the representative's understanding of the RFP, PSI would need to perform over 240 borings, or at least four per foundation. (*Id.*) PSI refused to perform the pilot holes at each shaft without an increased fee and neither Kiewit nor AECOM would provide the additional compensation. (Docs. 84 at 15–16; 86 at 12–13.) AECOM then hired a replacement subcontractor to perform the pilot hole borings for each shaft location. (Doc. 84 at 16.)

AECOM sued PSI, bringing two claims for breach of contract and, in the alternative, two claims for negligence. (Doc. 1-1.) PSI counterclaimed, alleging AECOM breached its contract with PSI and, in the alternative, AECOM was liable to PSI for unjust enrichment. (Doc. 39.) PSI moves for summary judgment on all of AECOM's claims and for partial summary judgment on its counterclaims. (Doc. 88.) AECOM moves for partial summary judgment and asks the Court to conclude that PSI was obligated to perform a pilot boring at every drilled shaft location. (Doc. 83.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, In*c., 477 U.S. 242, 248 (1986).

8

A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must "go beyond the pleadings and her own affidavits" and point to evidence in the record that demonstrates the existence of a genuine issue for trial. *Id.* at 324 (quotation omitted). The Court reviews all the record evidence and draws all legitimate inferences in the nonmoving party's favor. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004).

## III.   ANALYSIS

AECOM brought two breach of contract claims: one claiming that PSI breached the requirement to perform the PHP and the other claiming that PSI breached by suspending its performance of other requirements under the contract. AECOM also claimed that PSI negligently misrepresented that the proposed scope of services included all the geotechnical services required by the RFP and that PSI was negligent in failing to recognize that the PHP was within the RFP and to advise AECOM that the RFP required more than PSI included in its scope of services. For its part, PSI counterclaimed that AECOM either breached its contract by failing to pay for services PSI contracted with AECOM to perform or, in the alternative, that AECOM was unjustly enriched by services PSI performed at AECOM's request, but for which AECOM never paid.

Both parties move for partial summary judgment. PSI contends that it is entitled to partial summary judgment because its contract with AECOM did not incorporate the RFP and that, even if it did, the RFP did not include the PHP. PSI further argues it is entitled to summary judgment against AECOM's tort claims because AECOM cannot provide evidence that it justifiably relied on PSI's representations to establish its negligent representation claim and that AECOM failed to proffer an expert opinion on the appropriate standard of care that PSI allegedly breached to establish its negligence claim. PSI also argues that AECOM cannot recover any damages for PSI's refusal to perform the PHP because those damages are barred by Florida's "first cost" doctrine. Finally, PSI argues that it is entitled to partial summary judgment on its counterclaims because PSI performed services AECOM requested but for which it never paid. AECOM moves for partial summary judgment on the basis that PSI's contract with AECOM required it to perform the PHP.

As discussed below, the Court concludes that PSI was contractually obligated to perform the PHP, that both of AECOM's tort claims survive summary judgment, and that Florida's "first cost" doctrine is inapplicable. The Court also concludes that PSI is not entitled to partial summary judgment against AECOM holding AECOM liable to PSI for breach of contract or unjust enrichment. But the Court rules that PSI is entitled to

summary judgment against AECOM's breach of contract claim for suspension of performance.

## A. Contract Claims

PSI and AECOM both move for partial summary judgment based on their interpretations of the contract. PSI argues that the contract did not incorporate the RFP and that the RFP did not include the PHP. AECOM argues the opposite—that the contract incorporated the RFP and that the RFP included the PHP. PSI further contends that it did not suspend performance as alleged in AECOM's second breach of contract count, and that AECOM is liable for unpaid invoices.

The Court concludes that the contract incorporated the RFP and that the RFP included the PHP. But the Court agrees that PSI cannot be held liable for suspension of performance as alleged in AECOM's second breach of contract claim because the contract's suspension clause does not apply to PSI's performance of the PHP.

### i. The Contract Required Pilot Borings at Every Proposed Drilled Shaft Location.

AECOM claims that PSI's refusal to perform pilot holes at every drilled shaft location constituted a material breach of contract. PSI responds that it was contractually obligated to perform only sixty SPT borings as outlined in its Subcontracted Services attachment to the contract. PSI is incorrect on both scores—its contract incorporated the

RFP and the RFP required pilot holes at every drilled shaft location, even if that contradicted a statement within the Subcontracted Services attachment.

When interpreting a contract under Florida law, a court should first look to the language of the contract, as it is the best evidence of the parties' intent. *See Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432, 433 (Fla. 1980); *White v. Fort Myers Beach Fire Control Dist.*, 302 So. 3d 1064, 1071 (Fla. 2d DCA 2020) (citation omitted); *see also Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992) (explaining that the "intent of the parties to the contract should govern the construction of a contract" (citation omitted)). If the terms of a contract "are clear and definite, they must be understood according to their ordinary meaning." *Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc.*, 609 So. 2d 66, 68 (Fla. 4th DCA 1992) (citation omitted).

"Where a contractual provision is unambiguous, no issue of fact is presented as to the meaning of the language or the parties' intent, and the moving party is entitled to judgment as a matter of law." *Pan Am. W., Ltd. v. Cardinal Com. Dev., LLC*, 50 So. 3d 68, 71 (Fla. 3d DCA 2010). A contract is ambiguous when there are competing reasonable interpretations of the instrument, but "fanciful, inconsistent, and absurd interpretations" do no not create ambiguity. *Nabbie v. Orlando Outlet Owner, LLC*, 237 So. 3d 463, 467 (Fla. 5th DCA 2018) (quoting *Vyfvinkel v. Vyfvinkel*, 135 So. 3d 384, 385 (Fla. 5th DCA

2014)). Extrinsic evidence may be used to interpret a latent ambiguity, an ambiguity that "do[es] not become clear until extrinsic evidence is introduced." *Bd. of Regents, Univ. of S. Fla. Bd. of Trs. v. Rowsey*, 320 So. 3d 954, 962 (Fla. 2d DCA 2021) (quotation omitted). If a contract uses technical terms beyond the understanding of the lay person or the court, the court may consider extrinsic evidence that explains the meaning of those terms to determine if the contract is ambiguous. *See Se. Banks Tr. Co. v. Higginbotham Chevrolet-Oldsmobile, Inc.*, 445 So. 2d 347, 348 (Fla. 5th DCA 1984) (allowing expert testimony to "show the meaning of technical terms" because such explanation "does not contradict or vary the written instrument, but simply places the court in the position of the parties when they made the contract" and using that expert testimony to find the contract was unambiguous); *see also NCP Lake Power, Inc. v. Fla. Power Corp.*, 781 So. 2d 531, 536 (Fla. 5th DCA 2001); *Hinote v. Brigman*, 33 So. 303, 305 (Fla. 1902).

Finally, "[e]very provision in a contract should be given meaning and effect and apparent inconsistencies reconciled if possible." *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979); *see Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (holding the same in construing insurance policies).

### 1.  The Contract Incorporated the RFP.

PSI contends that its contract did not incorporate the RFP issued by Tampa and thus it never agreed to perform the PHP. PSI relies on a provision in the attached

13

Subcontracted Services that "expressly reject[s]" incorporation of any other terms or documents into the contract. (Doc. 84-18 at 10 (emphasis omitted).) This provision directly conflicts with two provisions earlier in the contract, one expressly incorporating the Design Contract and the second giving precedence to the Design Contract over the Subcontracted Services attachment. (*Id.* at 1, 9.) Given these clear provisions, the contract incorporated the Design Contract and PSI assumed toward AECOM all of AECOM's obligations toward Kiewit as set forth in their Design Contract, notwithstanding the contradictory language included in the Subcontracted Services attachment. Of course, the Design Contract likewise incorporated the Prime Contract that expressly included the RFP requirements. So in the end, PSI agreed to the RFP requirements through a series of contract incorporations.

Beginning with the plain language, the contract between AECOM and PSI obligated PSI to "perform the services set forth in [the Subcontracted Services attachment]." (*Id.* at 1.) Three paragraphs down, the contract expressly incorporated the Design Contract between AECOM and Kiewit. (Doc. 84-18 at 1 ("Article 4").)[2] Not only

---

[2] The paragraph incorporating the Design contract provided as follows:

> 4. INCORPORATION OF SUBCONTRACT FOR DESIGN. Subconsultant assumes toward AECOM all of the obligations and responsibilities that AECOM assumes toward [Kiewit] in the Subcontract for Design between AECOM and Kiewit effective August 9, 2017. The Subcontract for Design between AECOM and Kiewit is attached at EXHIBIT C and incorporated herein by reference. Unless otherwise set forth in Article 26 (Special Terms and Conditions) in the event of a conflict or inconsistency between this Subcontract and the Subcontract for Design, the more stringent provision shall apply.

did the contract incorporate by reference the Design Contract, it also expressly required PSI to "assume[] toward AECOM all of the obligations and responsibilities that AECOM assumes toward Kiewit . . . in the Subcontract for Design between AECOM and Kiewit."[3] (*Id.*) Lastly, "in the event of a conflict or inconsistency" between the contract and the Design Contract, "the more stringent provision shall apply." (*Id.*) PSI concedes that the contract incorporated the Design Contract, but disputes that the "more stringent provision" clearly required it to construct a boring at every shaft location compared to every foundation. (Docs. 88 at 17; 98 at 9 & n.6.)

Turning next to the plain language of the Design Contract, which was also incorporated into the contract, it included a variety of obligations from the RFP and the Prime Contract between Kiewit and Tampa. Start with the Design Contract obligations for AECOM. They included Kiewit's design service obligations to Tampa; specifically, AECOM "assume[d] toward [Kiewit] all the obligations and responsibilities that [Kiewit]

---

(Doc. 84-18 at 1.)

[3] The parties appear to have mistakenly attached the Prime Contract between Tampa and Kiewit as Exhibit C to their contract instead of the Design Contract between AECOM and Kiewit. (Doc. 84-18 at 22.) Neither party argues that this error means that the contract did not incorporate the Design Contract. (Docs. 83 at 21; 88 at 17.) And the contract clearly referred to the Design Contract—the contract notes that AECOM's contract with Kiewit was executed on August 9, 2017, and titled "Subcontract for Design." (Doc. 84-18 at 1.) This identification comports with the Design Contract, which was executed on that date and titled the same. In contrast, the Prime Contract between Tampa and Kiewit was executed on September 7, 2017, and is titled "Design-Build Contract." (Doc. 84-18 at 22.) And because courts under Florida law may reform a contract suffering from a scrivener's error because the clear intent of the parties was a contract without the error, this Court will interpret the contract as if the Design Contract were attached as Exhibit C. *See Plantation Key Off. Park, LLLP v. Pass Int'l, Inc.*, 110 So. 3d 505, 508 (Fla. 4th DCA 2013).

assume[d] toward [Tampa], as set forth in the Prime Contract, insofar as applicable to the Design Services to be provided by [AECOM] hereunder." (Doc. 84-17 at 1–2.) The Design Contract also obligated AECOM to perform design services, including preparing "the design, plans and specifications, and design documentation, including any Technical Special Provisions for approval including all related work necessary to enable [Kiewit] to perform the construction specified in the Prime Contract." (Doc. 84-17 at 15.)

In turn, the Prime Contract incorporated the RFP and required Kiewit to perform all the work necessary to carry out its contract with Tampa "as set forth in the [RFP]." (Doc. 84-16 at 1.) Thus, Kiewit was responsible for performing the RFP and AECOM was responsible for all design work that was necessary for Kiewit to perform the construction in the RFP. The pilot borings at each shaft location required by item (4) in the Drilled Shaft Foundations for Bridges section of the RFP were a design service required to be done before construction began and thus composed a part of AECOM's obligations to Kiewit. (*See* Doc. 84-1 at 53 (RFP section VI.C.) (noting that the results of pilot borings must be provided "at least one (1) week before beginning construction of these [drilled] shafts").) As such, PSI owed an obligation to AECOM to complete the pilot borings because AECOM owed that duty to Kiewit and Kiewit to Tampa.

PSI contends that a provision in the attached Subcontracted Services prevents the contract from incorporating either the Prime Contract or the RFP. (Doc. 88 at 16–19.) At

16

the start of the attached description of Subcontracted Services, the contract states that the "Subcontract <u>only</u> consists of the Articles and Exhibits expressly set forth in the referenced Subcontract and any executed Change Order" and that any "additional Subconsultant terms and conditions, qualifications, restrictions or modifications to the terms and conditions of the Subcontract contained in Subconsultant's proposal, Scope of Work or other documents attached to or/ incorporated by reference into this Subcontract are *expressly rejected* and shall <u>*not*</u> be deemed to be part of this Subcontract." (Doc. 84-18 at 10 (emphasis in original).) Although AECOM entirely ignores PSI's argument on this score concerning the provision rejecting other incorporated documents, the Court concludes that this provision does not prevent the incorporation of the RFP given the plain meaning of other provisions in the contract.

Per its plain terms, the contract includes an order of precedence to apply "[i]n the event of a conflict within the Subcontract documents." (Doc. 84-18 at 9.) There is a direct conflict between the incorporation of the Design Contract and the provision in the Subcontracted Services attachment expressly rejecting any incorporation of other documents. But by including an order of precedence provision that places article four, which incorporates the Design Contract, above the Subcontracted Services in priority, the contract's meaning is clear by its own terms. (Doc. 83 at 24–25.) And AECOM's

17

obligations toward Kiewit enumerated in the Design Contract included all the geotechnical investigations required for preparing the design.

Even if the contract did not contain an order of precedence clause, the paragraph incorporating the Design Contract also states that where there is a conflict or inconsistency between the contract and the Design Contract, "the more stringent provision shall apply." (Doc. 84-18 at 1.) "Stringent" means "marked by rigor, strictness, or severity." *Stringent*, *Webster's Third New International Dictionary of the English Language Unabridged* (1993). As discussed below, the Design Contract, through incorporating the RFP, requires that pilot hole borings be performed at the site of each drilled shaft, totaling at least 240 borings. That is a more rigorous and stricter provision than the sixty-four borings included in PSI's Scope of Services—a premise which PSI implicitly concedes. (Doc. 88 at 13 (contending that interpreting the contract to require pilot hole borings at all drilled shaft locations would produce an absurd result by requiring PSI to perform substantially more work than the sixty-four borings it proposed).) Thus, there are two provisions that clearly express the parties' intent that the Design Contract, if in conflict with any other part of the contract, governs when it imposes a "more stringent" requirement than the contract.

PSI's last argument for rejecting incorporation likewise fails. PSI argues that the pilot holes were part of the construction services of the Prime Contract and were thus not a part of the design services undertaken by AECOM. In support, PSI cites testimony from

Jeff Blazowski, AECOM's corporate representative, that PSI was not required to perform another kind of testing that was also located within the geotechnical services section of the RFP. (Doc. 85-12 at 21–22.) But the plain language of the RFP rebuts any argument that the pilot holes were a part of the construction phase of the contract. The RFP provision requiring the performance of pilot holes "for each shaft location" also required that the contractor must "provid[e] the results of the pilot hole borings . . . at least one (1) week before beginning construction of these shafts." (Doc. 84-1 at 53 (RFP section VI.C).) The pilot holes thus had to be performed *before* construction could begin. They were not themselves a part of the construction services.

## 2. The RFP Required Pilot Holes Within Each Drilled Shaft Location.

Assuming the contract incorporated the RFP, PSI contends that the RFP did not require pilot borings to be performed for each drilled shaft location. Instead, it reads the RFP to require only the drilling of a pilot boring at each pier foundation. AECOM disputes this interpretation, arguing that the RFP unambiguously required pilot borings to be performed within the circumference of every planned drilled shaft because that is the very meaning of a pilot boring. Because there is no genuine dispute of fact identified in the record about the meaning of pilot and test borings and because the record evidence defines pilot borings as ones that must be performed within the circumference of the proposed

19

drilled shaft location, the Court concludes that the RFP (and by incorporation, the contract) unambiguously required a pilot boring in each proposed drilled shaft location.

For redundant drilled shaft bridge foundations—the type of foundations used for the Selmon West Extension—PSI was required to "perform at least one test boring in accordance with the Soils and Foundations Handbook *at* each bent/pier." (Doc. 84-1 at 53 (RFP section VI.C.) (emphasis added).) If PSI had designed non-redundant foundations, the RFP required PSI to perform "at least one SPT boring . . . *at* each drilled shaft location." (*Id.* (emphasis added).) In a separate section of the RFP, PSI was also required to perform "pilot borings *for* each shaft location." (*Id.* (emphasis added).)

The undisputed facts support defining a pilot boring as the process of investigating subsurface soil in the precise location of the proposed drilled shaft. By implication, this definition also requires that the boring be done within the circumference of the proposed drilled shaft location. The undisputed facts also support defining a test boring as the process of investigating the subsurface soil of the area surrounding the test boring. These terms are not used in common parlance or understood by the lay person; they are instead technical terms familiar to those in the industry. Because they are technical terms not susceptible to ordinary or non-technical meaning, the Court looks to extrinsic evidence to determine their definitions. *See Se. Banks Tr. Co.*, 445 So. 2d at 348. AECOM has provided evidence

explaining the meaning of each and PSI has not pointed to any evidence in the record that contradicts this explanation.

AECOM explains that a test boring "is performed within a 'test hole' or 'test shaft' to inform the engineer's decision on how to construct and support the superstructure being built" and helps "determine soil conditions in the project vicinity." (Doc. 83 at 7.) On the other hand, a pilot boring is "performed before construction of a drilled shaft within the circumference of the shaft location to analyze soil conditions in that precise location." (*Id.* at 6 (emphasis omitted).) In support, AECOM points to the testimony of three witnesses. Tom Cooling, the Principle Geotechnical Engineer for AECOM testified that a test boring is "a boring just in the vicinity of the shaft . . . it may not be specifically located at a shaft," but that a pilot boring "is a boring that would be specifically drilled at a given drill shaft location such that it would fall within the location of the shaft." (Doc. 85-8 at 2, 8.) Scott Collister, the former Deputy Manager of Surface Transportation at AECOM, explained pilot borings the same way: "A pilot boring is a boring that is performed before the construction of a drilled shaft to confirm the material that is there" and "is much smaller than the diameter of the actual drilled shaft that's constructed." (Doc. 85-9 at 2, 7.) Larry Moore, who worked for Tampa's representative on geotechnical investigations, echoed this general definition: "A test boring could be used in . . . a general vicinity of a pier for general design purposes" but the "intent of item number 4," the requirement for pilot hole borings,

"is to provide data at the individual shaft locations." (Doc. 85-14 at 7–8, 33.) The Florida Department of Transportation Specifications Package, which governed the RFP's implementation, also contemplated that pilot hole borings must be done within the circumference of the drilled shaft location: "When pilot holes are shown in the Plans[,] core a pilot hole[] prior to shaft excavation . . . *through part or all of the shaft.* . . . Prior to excavating load test shafts, provide pilot holes to a minimum depth of three times the diameter of the drilled shaft . . . ." (Doc. 85-6 at 48.)

Although PSI disputes that pilot borings are only those borings performed within the circumference of a proposed drilled shaft, it does not point to any evidence that contradicts this definition. (Doc. 98 at 18 & n.14.) Instead, the portions of the record it cites simply explain that a test boring could be the same as a pilot boring if the test borings were done within the circumference of the proposed drilled shaft location. That definition comports with AECOM's and would still require a pilot hole boring in each shaft location per the RFP.

First, PSI cites Lloyd Lasher's deposition where he notes that there is no difference between an SPT boring and a pilot hole. (Docs. 84-8 at 41; 98 at 18 & n.14.) But PSI omits Lasher's next sentence clarifying that there's no difference "if that's what's defined by the designer." (Doc. 84-8 at 41.) And that does not contradict the earlier explanation of pilot borings or test borings—it merely explains that a SPT boring can be a pilot boring.

And although PSI does not cite them, other portions of Lasher's testimony are no more helpful. Earlier in his deposition, he explained that test borings and pilot borings are not necessarily different—they can be the same "if the test boring meets the requirements set forth by the designer's defined pilot hole. We use test borings and design borings and other borings as pilot holes all the time . . . ." (Doc. 84-8 at 36.) This statement merely establishes that a test boring can be the same as a pilot boring, but it does not allow for pilot borings to be done outside the proposed shaft location. And a few pages later in his deposition transcript, Lasher confirms that "not all test borings are pilot borings." (Doc. 84-8 at 38.)

Other evidence likewise only supplements AECOM's explanation of the different kinds of borings. PSI cites an email from Cooling where he notes that "[t]he pilot borings [he] propose[s] would be SPT borings" and the deposition of Paul Passe where he notes that "you can use a design boring for a pilot hole." (Docs. 98-1 at 1; 84-4 at 25.) Again, there is no contradiction between AECOM's explanation of pilot borings and the fact that AECOM proposed to do SPT borings as the pilot borings. (Doc. 98-1 at 1 (email from an AECOM engineer).) Nor does the fact that a design boring can be used for a pilot hole boring contradict AECOM's definition of pilot borings.

PSI also argues that, if the Court interprets the contract using extrinsic evidence, the record demonstrates that AECOM did not intend that pilot borings were required at

every drilled shaft. But while AECOM's earlier conduct may be relevant if the Court were considering extrinsic evidence, the Court cannot do that here where the plain language of the contract and the RFP are unambiguous. The Court only consults extrinsic evidence for the limited purpose of determining the meaning of the terms of test boring and pilot hole boring.

Finally, PSI's textual arguments fail. PSI argues that because the SPT borings for non-redundant drilled shaft locations would be required "*at* each drilled shaft location" but pilot borings would be required "*for* each shaft location," the pilot borings must not be required at each individual shaft location. (Doc. 84-1 at 53 (RFP section VI.C.).) According to PSI, when the contract requires borings at a specific location, it uses the term "at." The fact that the contract uses "for" when describing where the pilot borings must be performed indicates that they are not required to be done *at* each shaft location but merely *for* each shaft location. PSI offers support from the Soils and Foundations Handbook, which required test borings to be done within 20 feet of each shaft. (Doc. 84-9 at 15.) Thus, according to PSI, the pilot borings would be compliant with the Handbook and would be "for" each shaft location so long as they were performed within 20 feet of the shaft.

PSI's argument relies on the presumption that a material variation of terminology implies a material variation of meaning. *See Fowler v. Gartner*, 89 So. 3d 1047, 1048 (Fla.

3d DCA 2012) ("[T]he use of different language in different contractual provisions strongly implies that a different meaning was intended." (quoting *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 703 (Fla. 2d DCA 2006)). Although the canon of meaningful differentiation provides persuasive evidence of a contract's meaning, it is not absolute. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* § 25, at 170 (2012) (noting that the "presumption makes sense when applied (as it usually is) pragmatically"). And despite "for" and "at" carrying different meanings, *compare At*, *Webster's Third New International Dictionary of the English Language Unabridged* (1993) ("[U]sed as a function word to indicate presence in, on, or near . . . ."), *with For*, *Webster's Third New International Dictionary of the English Language Unabridged* (1993) ("[T]o supply the need of . . . ."), the lack of material variation of meaning is less pronounced when considered in the context of the other terms of the contract. *See* Scalia & Garner, *supra*, § 2 at 56 ("Of course, words are given meaning by their context . . . ."). In particular, the contract requires pilot borings—which can only be conducted within the circumference of a proposed drilled shaft location—"for each shaft location." Whether "for" (to the satisfy the needs of) or "at" (to indicate the presence in or on) the shaft location, the definition of pilot borings mandates the boring occur within the circumference of the drilled shaft. Thus the preposition proceeding lends less material meaning to the requirement.

And the Soil and Foundations Handbook's requirement that the test borings—not pilot borings—be performed within 20 feet sheds no light on the RFP's requirements for pilot hole borings. A pilot boring would always satisfy the undisputed definition of test boring, but a test boring need not necessarily satisfy the undisputed definition of a pilot boring.

Further, PSI's textual arguments leave item (4) of the RFP without independent force. PSI argues test borings are the same as pilot borings and need not be conducted within the circumference of the proposed shaft location. And it argues that the RFP merely requires the contractor to perform them at every pier or bent. It finally argues that a boring at every pier or bent would qualify as a boring "for" every drilled shaft because each shaft would be within twenty feet of one of the sixty borings required by the RFP. That interpretation renders item (4) redundant, simply repeating item (2)'s requirement that a test boring be performed at each bent or pier. But Florida law disfavors interpreting contracts in a way that renders some portions of the contract ineffective. *See Excelsior Ins. Co.*, 369 So. 2d at 941; *Philip Morris Inc. v. French*, 897 So. 2d 480, 488 (Fla. 3d DCA 2004) ("Courts are required to construe a contract as a whole and give effect, where possible, to every provision of the agreement."). Here, the language clearly communicates independent meanings through the RFP's use of two different terms in item (2) and item

(4). Item (2) requires that a test boring be performed at each bent or pier while item (4) requires that a pilot boring be performed for each shaft location.

Giving effect to all its provisions and according to the plain meaning of the terms, the Court interprets the RFP to require that a pilot boring be performed for each drilled shaft location. Thus, the RFP requires a pilot boring be performed within the circumference of every proposed drilled shaft location, and PSI was obligated to do that under the contract.

### 3. Conclusion.

AECOM moves for partial summary judgment concluding that the contract incorporated the RFP and that the RFP required the PHP. The Court agrees and grants AECOM's motion for partial summary judgment and denies PSI's motion on the same issue.

### ii. PSI Is Not Liable for Suspension of Performance.

PSI contends that it is entitled to summary judgment on AECOM's claim for suspension of performance because the undisputed facts show that PSI never suspended performance. In its complaint, AECOM claims that PSI violated Articles 12, 13, and 17 of the contract when it suspended its performance. These articles required PSI to continue performing the Subcontracted Services even if a dispute arose over the contract. But the Subcontracted Services did not include the PHP, an obligation that PSI undertook in a

different section of the contract, and so these provisions only required PSI to continue performing its non-PHP obligations while the dispute was settled. And PSI points to evidence that it did continue performing—evidence that AECOM fails to contradict.

As noted in AECOM's complaint, the contract prohibited PSI from "suspend[ing] its performance or otherwise fail[ing] to maintain the timely progress of the Subcontracted Services," required PSI to take responsibility for delays of the Subcontracted Services, and required PSI to "proceed diligently with the performance of the Subcontracted Services as directed by AECOM" pending resolution of any dispute about the contract. (Doc. 84-18 at 5–8 (PSI Contract §§ 12, 17).) The contract defines "Subcontracted Services" as the services set out in Exhibit A of the contract. (Doc. 84-18 at 1.) Exhibit A itself incorporates an exhibit which lists the services PSI undertook to perform for AECOM, which included only sixty SPT borings—not a pilot boring at every proposed drilled shaft location as required by the RFP. (Doc. 84-18 at 10.) Thus, although PSI was obligated to perform the PHP because of the "flow down" clause in Article 4 of the contract wherein PSI assumed all obligations under the Design Contract, it was not contractually prohibited from suspending performance on the PHP because the PHP was not part of the Subcontracted Services.

And, as PSI shows, the undisputed facts show PSI never suspended performance on the Subcontracted Services. AECOM's corporate representative testified that he was "not

aware of a - - like a complete suspension of [PSI's] work" and that he "[did] not know for sure" whether documents were withheld by PSI. (Doc. 86-5 at 111.) And he also testified that the only time AECOM returned any of PSI's deliverables on the project, PSI resubmitted the deliverables. (*Id.* at 164.)

AECOM offers no evidence that PSI suspended performance on non-PHP contractual duties—and even appears to concede the point. (Doc. 97 at 11–12.) Instead, AECOM contends that PSI suspended performance on the contract because it did not perform the PHP. (*Id.*) But, as discussed above, PSI did not violate the contract's prohibitions on suspension of performance by suspending performance on the PHP—it would only have violated those prohibitions if it suspended performance on the Subcontracted Services.[4]

### iii. PSI Is Not Entitled to Partial Summary Judgment on Its Counterclaims.

PSI contends it is entitled to partial summary judgment on its counterclaims for either breach of contract or unjust enrichment against AECOM. In its counterclaims, PSI asserts that AECOM requested services from PSI that PSI performed; PSI sent AECOM invoices; and AECOM never paid. PSI claims that this constituted a breach of contract or, in the alternative, unjust enrichment. The undisputed facts prove that PSI has established

---

[4] Of course, as discussed previously, the contract obligated PSI to perform the PHP. But AECOM's second count complains that PSI failed to perform the services unrelated to the PHP.

its prima facie case for breach of contract, but AECOM also establishes an affirmative defense which PSI fails to rebut. PSI is thus not entitled to partial summary judgment on AECOM's liability for breach of contract. Further, because a valid contract governs the disputed payments, PSI cannot show that AECOM is liable as a matter of law on PSI's unjust enrichment claim.

PSI points to sufficient facts establishing its prima facie case for breach of contract. A claim for breach of contract requires "(1) a valid contract; (2) a material breach; and (3) damages." *Abbott Lab'ys, Inc. v. Gen. Elec. Cap.*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000). PSI and AECOM executed a valid contract. This contract required PSI to perform specified services and for AECOM to pay PSI for these services. (Doc. 84-18 at 15–18 (discussing compensation and rates).) And if AECOM needed PSI to perform additional or different services than those set out in the contract, it could request such changes and pay PSI accordingly. (*Id.* at 15.)

PSI points to testimony confirming that AECOM requested PSI perform additional work (unrelated to the PHP), that PSI performed the work, and that AECOM never paid. The first unpaid item was $26,613 for two additional borings at Pier 2E. Wally Jordan, "a practice leader in the Complex Bridge Group" at AECOM, confirmed that he asked PSI to do additional boring work at Pier 2E because it was originally designed to be

a "driven pilot" but was changed to a "drilled shaft."[5] (Doc. 86-6 at 9, 29–31.) Jordan also confirmed that PSI complied with the request. (*Id.* at 31.) The second unpaid item was $9,085 for an additional boring at Pier 43D. Jordan confirmed that an additional boring at Pier 43D was "beyond the original scope of work" and that he approved the invoice for the work. (*Id.* at 31–32.) The third unpaid item was $16,316 for two additional borings at End Bent 40. AECOM conceded in its answers to PSI's request for admissions that PSI performed those two additional borings. (Doc. 87-18 at 1.) AECOM also conceded that it has not paid PSI for any of the work described in the November 2018 invoice. (*Id.*)

PSI has thus demonstrated that it performed services for additional work requested and approved by AECOM, invoiced AECOM for the services, and that AECOM never paid, despite the contract requiring payment. In its response, AECOM does not dispute these facts or provide a legal argument for why this does not constitute a breach of contract. Instead, it argues that PSI has failed to overcome AECOM's affirmative defenses. Several of AECOM's defenses concern PSI's damages and are thus irrelevant to the question of partial summary judgment based on AECOM's liability.

But AECOM raises one affirmative defense which, if established, would prevent AECOM from being liable to PSI for breach of contract. Specifically, AECOM asserts that if PSI breached the contract first, Florida law "prohibit[s PSI] from recovering any

---

[5] AECOM's corporate representative confirmed that he defers to Jordan's testimony about the additional borings at Pier 2E. (Doc. 86-5 at 159–60.)

31

damages resulting from any breach on the part of AECOM." (Doc. 97 at 19.) "It is settled contract law in Florida that a breach by anticipatory repudiation allows the nonbreaching party to terminate his own performance and bring litigation for damages." *Aberdeen Golf & Country Club v. Bliss Constr., Inc.*, 932 So. 2d 235, 240 (Fla. 4th DCA 2005). And a party breaches by anticipatory repudiation where a party engages in "words or acts evincing an intention to refuse performance in the future." *Alvarez v. Rendon*, 953 So. 2d 702, 709 (Fla. 5th DCA 2007). Thus, if PSI first breached its contract with AECOM, AECOM was entitled to cease performance on the contract and sue for damages.

Because a reasonable finder of fact could find that PSI breached the contract first, PSI is not entitled to partial summary judgment regarding AECOM's liability. A disputed material fact remains as to who breached the contract first. PSI told AECOM in March of 2018 that it would not perform the PHP. (Doc. 84-25 at 2–3.) PSI billed AECOM in November 2018 for services and, because the contract requires PSI to submit invoices monthly, a reasonable finder of fact could infer that PSI performed these services in either October or November of 2018, several months after PSI told AECOM it would not perform the PHP. (Doc. 84-18 at 15; 86-30 at 20–23.) The Court need not decide at this stage that PSI breached its contract with AECOM first, but AECOM's assertion of its

defenses, combined with the facts in the record, are sufficient to preclude summary judgment as a matter of law in PSI's favor.[6]

And because there is a valid contract that governs the services PSI performed, PSI is not entitled to summary judgment on its unjust enrichment claim. Where one party is "unjustly enriched," a court may find a "contract implied in law, or quasi contract." *Com. P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997), *as modified on clarification* (June 4, 1997). That is, a claim for unjust enrichment is just a request for a court to imply a contract that does not exist in fact. But, under Florida law, when there is a valid contract governing the dispute, a plaintiff cannot recover under a contract implied by law—instead, the express contract governs. *See Agritrade, LP v. Quercia*, 253 So. 3d 28, 34 (Fla. 3d DCA 2017). Here, the contract governs the November invoice. To the extent that the invoice billed AECOM for services beyond the initial scope in the contract, the contract still governed because the services were approved by AECOM through the process in the contract. (Doc. 84-18 at 15.) Specifically, PSI notes that two of the items it billed in its November invoice were outside the initial scope of services, but points to testimony from the project manager who was required to approve the additional services, confirming that he approved the additional services. (Doc. 86-6 at 29–32.)

---

[6] PSI may still be entitled to damages on its breach of contract claim if it can overcome AECOM's defense at trial. But PSI has not offered any factual or legal arguments that show that the record demonstrates AECOM's defense fails.

## B. Tort Claims

PSI moves for summary judgment against AECOM's claims for negligent misrepresentation and negligence. Both arguments fail.

### i. AECOM's Negligent Misrepresentation Claim May Proceed.

AECOM's third count alleges that PSI negligently misrepresented its scope of services as including the geotechnical services required by the RFP. (Doc. 1-1 at 6.) PSI moves for summary judgment on this count because it contends AECOM fails to establish that it justifiably relied on PSI's representation. (Doc. 88 at 23.) Because PSI misstates the legal standard and the record evidence would permit a reasonable finder of fact to conclude that AECOM justifiably relied on PSI's representations, the Court denies PSI's requested relief on this count.

Under Florida law, negligent misrepresentation requires "(1) a misrepresentation of material fact that the defendant believed to be true but which was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury." *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc.*, 232 So. 3d 502, 505 (Fla. 1st DCA 2017) (citation omitted); *see also Hasenfus v. Secord*, 962 F.2d 1556, 1561 (11th Cir. 1992) (applying Florida law). Justifiable reliance requires more than lack of actual knowledge of the

34

representation's falsity, but does not mandate that the plaintiff have independently investigated the representation. *See Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. 1st DCA 2011) ("[A] misrepresenter is precluded from arguing that the recipient of information did not justifiably rely because he or she failed to conduct an adequate independent investigation."). For example, justifiable reliance has been found where a potential property buyer asked the seller about a boundary dispute and then relied on the defendant's representation of where the boundary line was located. *See id.* at 308 (discussing facts); *id.* at 310–11 (affirming "the jury's finding that [the plaintiff buyer] justifiably relied on [defendant seller]'s negligent misrepresentations").

AECOM claims that PSI negligently misrepresented that its proposed scope of services and price included all the geotechnical services required by the RFP. (Doc. 1-1 at 6.) It notes that, at different times prior to Tampa awarding the contract to Kiewit, PSI assured AECOM that the project would not require borings for each shaft and that all geotechnical investigations required by the RFP were included in its price. (Docs. 84-7 at 2; 84-12 at 7; 84-8 at 21–22.) PSI argues that AECOM should have investigated whether PSI's proposed scope of services and price adequately addressed the RFP's requirements and that AECOM's failure to do so is fatal to its negligent misrepresentation claim. (Doc. 88 at 23–25.)

But PSI misstates the standard for negligent misrepresentation. PSI seems to suggest that, if AECOM did not investigate the representations, it could not—as a matter of law—have acted in justifiable reliance on PSI's representations. (*Id.* at 24.) But Florida law imposes no absolute duty to investigate as part of "justifiable reliance." Florida law instead requires that a plaintiff bringing a claim of negligent misrepresentation show that he acted in "justifiable reliance" on the negligent misrepresentation. *See Butler*, 44 So. 3d at 105. Whether a plaintiff acts in justifiable reliance when he failed to investigate turns on whether "a reasonable person in the position of the recipient [of the representation] would be expected to investigate" the representation. *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997).

PSI relies on *Gilchrist*, noting that "the recipient of an erroneous representation can[not] hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error." *Id.* But that argument omits the context of the statement: the Florida Supreme Court was explaining that a recipient might be comparatively negligent and suffer a reduction in damages if he failed to investigate. The Florida Supreme Court also clarified that "a recipient of information will not have to investigate every piece of information furnished." *Id.*; *see also Newbern v. Mansbach*, 777 So. 2d 1044, 1046 (Fla. 1st DCA 2001) ("*Gilchrist* in no way suggests that a cause of action may be precluded as a matter of law based on the trial court's determination that a plaintiff

reasonably could have discovered the information and/or that such information is part of public record."); *Specialty Marine & Indus. Supplies, Inc.*, 66 So. 3d at 311 (affirming jury finding that plaintiff justifiably relied on defendant's representations and applying "principles of comparative negligence" to conclude that the defendant "w[as] only 90[ percent] the cause of [the plaintiff]s damages").

Thus, a plaintiff might justifiably rely on a defendant's representation even if he was likewise negligent in not investigating the representation. For example, the Florida Supreme Court reversed a trial court's determination that failure to exercise "due diligence" prevented the plaintiff from justifiably relying on the defendant's representations. *Butler*, 44 So.3d at 103. The Court held that "justifiable reliance on a representation is not the same thing as failure to exercise due diligence." *Id.* at 105. And it clarified in other opinions that, where a plaintiff is negligent in investigating a representation, the appropriate course is to offset the plaintiff's damages according to ordinary comparative negligence rules. *See Gilchrist Timber*, 696 So.2d at 339; *Specialty Marine & Indus. Supplies, Inc.*, 66 So. 3d at 311 (affirming jury finding that plaintiff justifiably relied but nonetheless finding the misrepresentations were the cause of ninety percent of the plaintiff's damages).[7]

---

[7] PSI cites a decision from this district noting that "an action for negligent misrepresentation cannot be maintained if an investigation by the recipient of the information would have revealed the falsity of the information." *Scolieri v. John Hancock Life Ins. Co. (U.S.A.)*, No. 2:16-CV-690-FTM-38CM, 2017 WL 700215, at *6 (M.D. Fla. Feb. 22, 2017). To the extent that statement of the law was intended to be absolute, the Court respectfully disagrees, as it does not account for *Gilchrist*'s full holding that a defendant may prove a plaintiff was comparatively negligent without necessarily disproving the plaintiff's justifiable reliance on the representations.

37

Because a failure to investigate is not fatal to AECOM's negligent misrepresentation claim as a matter of law, PSI must show that the evidence is insufficient for a reasonable factfinder to conclude that AECOM justifiably relied on PSI's representations. *Gilchrist Timber Co.*, 696 So. 2d at 339; *see also Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1251 (11th Cir. 2007) (affirming summary judgment against a plaintiff's negligent misrepresentation claim because the plaintiff had not provided evidence on an essential element). PSI does not clear that hurdle.

To support its contention that AECOM cannot establish justifiable reliance, it points to facts purportedly showing that AECOM failed to investigate whether PSI's scope of services covered AECOM's contractual commitments to Kiewit, failed to clarify with Tampa the precise scope of the geotechnical requirements of the RFP, and failed to obtain other bids for the geotechnical work. (Doc. 88 at 24–25.) PSI also points out that in April 2017—before Tampa awarded Kiewit the contract or AECOM executed its agreement with PSI—two of AECOM's employees discussed "test drilling every drilled shaft," suggesting that AECOM knew that pilot borings may be the best method for geotechnical investigation. (Docs. 86 at 5; 86-9 at 2.) PSI also points out that AECOM had extensive geotechnical experience, making reliance less justified.

AECOM responds that it justifiably relied on PSI's representations that its scope of services and price included all the geotechnical investigation required by the RFP unless

specifically excluded. (Docs. 84-7 at 2; 84-12 at 7; 84-8 at 21–22.) Specifically, AECOM argues that PSI knew it would rely on PSI's scope of services and fee estimate to properly calculate the fixed-price bid. For example, in the bid process, Tampa asked Kiewit to confirm that Kiewit "underst[ood] that Geotechnical explorations are to be completed in accordance with the . . . project RFP requirements and that the cost of site investigations to meet the requirements of . . . the project RFP requirements will be included in [Kiewit's] bid price." (Doc. 84-12 at 7.) An employee of PSI confirmed that PSI was assigned this question and PSI subsequently responded in the affirmative. (Docs. 84-8 at 21–22; 84-12 at 7.) And in PSI's proposed scope of services, incorporated into the contract, PSI stated that, based on its review of the RFP, it had "outlined a scope of services to obtain geotechnical information that will be needed in the design of the proposed improvements." (Doc. 84-18 at 12.)

AECOM also points to statements from those familiar with the project that would allow a reasonable factfinder to find justifiable reliance. Lloyd Lasher, PSI's corporate representative, confirmed that "PSI understood . . . that AECOM was going to rely on the fee estimate in preparing its bid" and that AECOM and Kiewit "had a right to rely on . . . PSI's interpretation as to what was required with respect to the geotechnical design under the . . . RFP." (Doc. 84-8 at 17, 19.)

Although PSI has offered evidence that is probative of whether AECOM justifiably relied on PSI's misrepresentations, the Court is unable to conclude that no reasonable factfinder could find AECOM's reliance unjustified. *See Specialty Marine & Indus. Supplies, Inc.*, 66 So. 3d at 311 (finding sufficient evidence supported jury's conclusion that the plaintiff's reliance was justifiable where the defendant misrepresented the extent of a property dispute, even though the plaintiff obtained a report from a third-party investigator).

### ii. PSI Is Entitled to Summary Judgment Against AECOM's Negligence Claim.

PSI moves for summary judgment against AECOM's negligence claim, arguing that AECOM failed to provide expert testimony establishing that PSI breached the relevant standard of care in the geotechnical industry. AECOM responds by pointing to an expert report. Neither party briefs whether that expert report (or his deposition testimony) is admissible under Federal Rule of Evidence 702, so the Court does not address the admissibility issue here. And because AECOM's expert report facially satisfies its burden to offer an expert opinion on the appropriate standard of care in this context, PSI's motion fails at this juncture.

Under Florida law, where a plaintiff brings a negligence claim against a professional who was carrying out his profession when he purportedly violated his duty to the plaintiff, the plaintiff must show that the defendant failed to adhere to "the standard of care used by

similar professionals in the community under similar circumstances." *Moransais v. Heathman*, 744 So. 2d 973, 976 (Fla. 1999), *receded from on other grounds in Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 407 (Fla. 2013). In claims for professional negligence, if the standard of care is not "so obvious as to be apparent to persons of common experience," Florida law requires "expert testimony . . . to ascertain what skills and means and methods are recognized as necessary and customarily followed in the [professional] community." *O'Grady v. Wickman*, 213 So. 2d 321, 324 (Fla. 4th DCA 1968); *see also U.S. ex rel. J&A Mech., Inc. v. Wimberly Allison Tong & Goo*, No. 6:05-CV-1207-ORL-31DAB, 2006 WL 3388450, at *3 (M.D. Fla. Nov. 21, 2006) (Presnell, J.) (same). Neither party disputes that expert testimony is required in this context, as an ordinary person would not know the appropriate standard of care required in analyzing the RFP and advising AECOM on the scope of engineering services to satisfy the RFP's requirements.

Although exceedingly brief, AECOM provides an expert report which provides standards sufficient for a factfinder to know what "means and methods are recognized as necessary and customarily followed in the [engineering] community." *O'Grady*, 213 So. 2d at 324. AECOM's expert concluded that "PSI had an obligation to address all of the Geotechnical requirements set forth in the RFP in its Proposal," including "the cost and provision of pilot holes." (Doc. 89-2 at 1.) Second, AECOM's expert concluded that "PSI

had an obligation to assure that pilot holes were included in the scope of work, regardless of whether or not they intended to include it in the PSI proposal." (*Id.*) Third, AECOM's expert concluded that, if "PSI intended to exclude the pilot holes, it should have specifically stated the exclusion in its Proposal." (*Id.*)

These opinions are framed as obligations or imperatives. Although likely insufficient to satisfy Rule 702 based only on this report, the expert sets out a standard by which the factfinder could determine if PSI failed to satisfy the standard of care of professionals in its industry.

PSI argues that these opinions are insufficient because they are cursory. Admittedly they are. But they are sufficient to inform the factfinder of what standard PSI must meet to satisfy its duty of care. The only case PSI cites where a court found the expert's opinions too cursory to satisfy Florida's standard the expert merely stated that the defendant's performance was "deficient." *U.S. ex rel. J&A Mech., Inc.*, 2006 WL 3388450, at *3. But "deficient" provides no standard of care by which a factfinder could determine a breach. In contrast, AECOM's expert provides industry-specific tests by which the factfinder may, at trial, determine whether PSI breached its standard of care.

PSI also argues that AECOM cannot state a claim for professional negligence because its expert does not conclude that PSI breached its standard of care. (Doc. 88 at 22–

23.) But PSI does not cite any case requiring that an expert provide both a standard of care and conclude that the standard of care was breached.

Finally, PSI replies that the disclosure of these expert opinions fails to satisfy Federal Rule of Civil Procedure 26(a)'s requirements. The Court is inclined to agree that the report lacks the necessary information, but PSI waived its Rule 26(a) argument by failing to raise it in the initial motion. *See United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999) ("Defendant, however, raised this issue for the first time in his reply brief. Defendant, therefore, has waived this claim."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

Although the Court may only consider admissible evidence when adjudicating a motion for summary judgment, *see Snover v. City of Starke*, 398 F. App'x 445, 449 (11th Cir. 2010), neither party offers a reason—other than PSI's waived Rule 26 argument—why the report would be inadmissible. The Court declines to decide the admissibility of an expert report without arguments from the parties but notes that the report lacks any mention of the expert's qualifications, the bases for his opinions, or the methodology applied in arriving at them. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (noting that the district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury").

### C. First Cost Damages

PSI also argues that it is entitled to summary judgment against all of AECOM's claims. PSI's logic is as follows: if the PHP was within its own scope of services for AECOM, it must also have been within AECOM's scope of services for Kiewit. Thus, AECOM was always responsible for the pilot borings. Furthermore, Tampa was always going to pay for the PHP as it was a part of the RFP. PSI concludes then that because Tampa was always planning to pay for the PHP, the PHP was a "first cost," preventing AECOM from recovering those costs as damages against PSI. This argument fails.

Under Florida law, the first cost doctrine proscribes a party from obtaining damages that put it in a better place than it would have been if a contract was performed as agreed or if a tort never occurred. *See Sch. Bd. of Broward Cnty. v. Pierce Goodwin Alexander & Linville*, 137 So. 3d 1059, 1072 n.9 (Fla. 4th DCA 2014) (noting that the rule applies in both contract and negligence cases); *Soriano v. Hunton, Shivers, Brady & Assocs.*, 524 So. 2d 488, 489 (Fla. 5th DCA 1988). Thus, the doctrine prevents a plaintiff from recovering contract damages "above and beyond the value of the original 'benefit of the bargain,'" *Salomon Constr. & Roofing Corp. v. James McHugh Constr. Co.*, No. 1:18-CV-21733-UU, 2019 WL 5256980, at *3 (S.D. Fla. Mar. 22, 2019) (Ungaro, J.), and prevents tort victims from obtaining a windfall.

An early adopter of the rule provides a helpful example. *See Lochrane Eng'g, Inc. v. Willingham Realgrowth Inv. Fund, Ltd.*, 552 So. 2d 228 (Fla. 5th DCA 1989). An engineer who is hired to consult on a project and opines that one-thousand units is sufficient is not necessarily liable to the client for an additional two-hundred units if the client later learns that twelve-hundred units are necessary. *See id.* at 232–33. The client's original project would necessarily be twelve-hundred units regardless of the engineer's negligence in advising that one-thousand units sufficed, so the need for the additional two-hundred units was not caused by the engineer's mistake. *See id.* at 233. The engineer might still be liable for any damages his mistake caused, such as the hassle the client suffers in redesigning the project. *See id.* On the other hand, an owner who engages a contractor to perform a service for a fixed price is not precluded by the first cost doctrine from obtaining damages when the contractor fails to perform as specified in the contract. *See id.* at 232. The reason for the rule being that the owner might have selected a different contractor for a different price, whereas the original owner would still need to fund the additional two-hundred units (absent any opportunity cost or similar damages attributable to the engineer's mistake). *Cf. Sch. Bd. of Broward Cnty.*, 137 So. 3d at 1070–71 (observing that the first cost doctrine's role "is to assure that a party entitled to damages is not placed, because of the breach, in a position better than which he would have occupied had the contract been performed as agreed" (quotation and alteration omitted)).

PSI fails to show how this rule applies here. If AECOM prevails at trial for breach of contract, it would be entitled to damages that place AECOM in the same place that it would have been had the contract been performed. *See Sch. Bd. of Broward Cnty.*, 137 So. 3d at 1070 ("[I]t is well-settled that the purpose of damages is to restore an injured party to the same position that he would have been in had the other party not breached the contract." (quotation omitted)). Specifically, AECOM would not have needed to pay the third-party contractor to perform the PHP—it would just have paid the contract price. And if AECOM prevails at trial for negligence or negligent misrepresentation, it would be entitled to damages that place AECOM where it would have been had PSI not been negligent. *See Torres v. Sarasota Cty. Pub. Hosp. Bd.*, 961 So. 2d 340, 345 (Fla. 2d DCA 2007). The Court will not speculate as to what actions AECOM would have taken had PSI not allegedly negligently misrepresented whether the PHP was covered by its scope of services and price or what AECOM might have done had PSI not been allegedly negligent in believing its proposed scope of services covered all the RFP requirements or in advising the same to AECOM. But a reasonable finder of fact could conclude that AECOM might have raised its fee before entering a contract with Kiewit or not entered the contract at all. As such, PSI fails to show that the PHP is a first cost AECOM would have necessarily incurred.

## IV.   CONCLUSION

The Court concludes that the contract obligated PSI to perform the PHP and thus that AECOM is entitled to partial summary judgment regarding that obligation. The Court also concludes that PSI fails to show it is entitled to summary judgment on AECOM's damages, summary judgment on AECOM's negligent misrepresentation claim, summary judgment on AECOM's negligence claim, or partial summary judgment on PSI's breach of contract or unjust enrichment claims. But PSI is entitled to summary judgment against AECOM's breach of contract for suspension of performance claim. Accordingly, the following is **ORDERED**:

1.   AECOM's Motion for Partial Summary Judgment (Doc. 83) is **GRANTED**.

2.   PSI's Motion for Partial Summary Judgment (Doc. 88) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Specifically, the Court **DENIES** summary judgment on the basis that the contract did not require the Pilot Hole Program; **DENIES** summary judgment on the basis that AECOM's damages are barred under the first cost doctrine; **DENIES** summary judgment on AECOM's negligent misrepresentation claim; **DENIES** summary judgment on AECOM's negligence claim; and **DENIES** partial summary judgment on the counterclaims for breach of contract and unjust

47

enrichment. But the Court **GRANTS** summary judgment for PSI against

AECOM's claim for breach of contract for suspension of performance.

**ORDERED** in Tampa, Florida, on December 29, 2021.

Kathryn Kimball Mizelle
United States District Judge